PUʙʟIC COPY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

Sable Networks, Inc. and
Sable IP, LLC,

      Plaintiffs,

      v.

Cloudflare, Inc.,

      Defendant.

Civil Action No.
6:21-cv-00261-ADA-DTG

JURY TRIAL DEMANDED

███████████████
████████████████████
████████████

## CLOUDFLARE'S MOTION TO EXCLUDE EXPERT OPINIONS
## OF MR. STEPHEN E. DELL AND DR. TZE SING EUGENE NG

Cʜᴀʀʜᴏɴ Cᴀʟʟᴀʜᴀɴ
Rᴏʙsᴏɴ & Gᴀʀᴢᴀ, PLLC

Sᴛᴇᴠᴇɴ Cᴀʟʟᴀʜᴀɴ
Cʜʀɪsᴛᴏᴘʜᴇʀ T. Bᴏᴠᴇɴᴋᴀᴍᴘ
Aɴᴛʜᴏɴʏ M. Gᴀʀᴢᴀ
C. Lᴜᴋᴇ Nᴇʟsᴏɴ
Mɪᴛᴄʜᴇʟʟ R. Sɪʙʟᴇʏ
Jᴏʜɴ Hᴇᴜᴛᴏɴ

*Counsel for Defendant Cloudflare, Inc.*

July 24, 2023

## <u>TABLE OF CONTENTS</u>

I.    STATEMENT OF FACTS ................................................................................................. 1

    A.  Cloudflare offers a wide variety of network, security, and developer-platform services for companies located around the world ............................................................ 1

    B.  Cloudflare's edge servers, located around the world, are built with commodity hardware and perform many functions......................................................................... 2

    C.  Mr. Dell's reasonable-royalty calculation ....................................................................... 4

        1.   Mr. Dell focuses on Cloudflare's "enterprise" customers ......................................... 5

        2.  Mr. Dell's royalty base includes *worldwide* enterprise-customer revenues attributable to *all* of Cloudflare's products ..................................................... 8

        3.  Mr. Dell claims that 20%-30% of Cloudflare's worldwide enterprise-customer revenue should be apportioned to patented features based on Magic Transit's and Argo for Packets' marginal improvements to "latency" and "packet loss."....... 8

        4.  Even though Cloudflare has never been profitable, Mr. Dell applies hypothetical profit margins to calculate robust apportioned profits............................................. 10

        5.  Mr. Dell claims that *all* of the apportioned profits constitute a reasonable royalty ................................................................................................................. 10

II.   LEGAL BACKGROUND ................................................................................................. 10

III.  ARGUMENT ................................................................................................................... 11

    A.  Mr. Dell did not exclude Cloudflare's overseas activity, which cannot infringe United States patents as a matter of law, rendering all of his calculations unreliable .... 11

    B.  Mr. Dell's apportionment methodology is unreliable ..................................................... 14

        1.  Mr. Dell's focus on improvements to latency and packet dropping does not reliability apportion Cloudflare revenue between the value of the allegedly infringing features and the value of the other products and services provided to Cloudflare's enterprise customers........................................................................ 16

        2.  Mr. Dell's apportionment analysis is independently unreliable because it does not identify, separate out, and value the unpatented features ................................... 19

        3.  Additionally, Mr. Dell has provided no reliable basis to extend his 20%-30% apportionment figure, based on quantified improvements for users of Magic Transit and Argo for Packets, to revenue from enterprise customers that do not use Magic Transit or Argo for Packets. .................................................................. 22

        4.  Further, Mr. Dell has provided no reliable basis to extend his 20-30% apportionment figure, based on improvements for users of Magic Transit and Argo for Packets, to L4Drop..................................................................................... 24

C. Dr. Ng has not reliably supported his claim that customers who do not use Magic Transit and Argo for Packets receive a better experience, further rendering Mr. Dell's apportionment analysis unreliable ................................................................................ 25

    1. If the Court strikes Dr. Ng's opinion, Mr. Dell's apportionment analysis must be excluded because he failed to restrict revenue to the smallest salable unit ............ 27

D. Mr. Dell's calculation of Cloudflare's apportioned profits is unreliable ....................... 28

    1. The 42% "Unit Economic Margin" is not a profit margin, and cannot reliably calculate apportioned profit ................................................................................... 29

    2. Mr. Dell's "normalization" does not reliably estimate profit ................................. 31

E. Mr. Dell improperly seeks disgorgement in the guise of a royalty ................................. 35

F. Mr. Dell's alternate royalty-rate calculation at footnote 377 is unreliable..................... 37

G. Because Mr. Dell did not set his hypothetical negotiation on the date that Cloudflare's alleged infringement began, the Court should exclude Mr. Dell's hypothetical-negotiation analysis in its entirety ................................................................................ 38

H. The Court should exclude non-disclosed infringement opinions ................................... 39

IV.    CONCLUSION ............................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Afro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964)............................................................................................35

*C.S.I.R.O. v. Cisco Sys.*,
  809 F.3d 1295 (Fed. Cir. 2015)........................................................................ passim

*Daedalus Blue LLC v. SZ DJI Tech. Co.*,
  No. 20-73-ADA, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022)............................................10

*Deepsouth Packing Co. v. Latiram Corp.*,
  406 U.S. 518 (1972)........................................................................................12, 13

*Ericsson, Inc. v. D-Link Sys.*,
  773 F.3d 1201 (Fed. Cir. 2014)..........................................................................11, 15

*Finjan, Inc. v. Blue Coat Sys.*,
  879 F.3d 1299 (Fed. Cir. 2018)..........................................................................19, 20

*Garretson v. Clark*,
  111 U.S. 120 (1884)........................................................................................11, 15

*Huss v. Gayden*,
  571 F.3d 442 (5th Cir. 2009) ...............................................................................26

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)..............................................................................38, 39

*Paz v. Brush Eng'd Mat'ls, Inc.*,
  555 F.3d 383 (5th Cir. 2009) ..................................................................................11

*Power Integrations, Inc. v. Fairchild Semicond. Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013)......................................................................12, 13, 14

*ProTradeNet, LLC v. Predictive Profiles, Inc.*,
  No. 18-38-ADA, 2019 WL 6499488 (W.D. Tex. Oct. 11, 2019)............................................11

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010)..................................................................................11

*RSA Protective Techs., LLC v. Delta Sci. Corp.*,
  No. 19-6024, 2021 WL 4978462 (C.D. Cal. Oct. 20, 2021)................................................39

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015)......................................................................11, 33, 36

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)............................................................................38

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)..................................................................... passim

*WesternGeco LLC v. ION Geophysical Corp.*,
   791 F.3d 1340 (Fed. Cir. 2015)......................................................................12, 13

*Wheat v. Pfizer, Inc.*,
   31 F.3d 340 (5th Cir. 1994) ................................................................................26

Plaintiff Sable's royalty estimates and damages calculations are based on faulty inputs and unjustified assumptions and should thus be excluded. In particular, Sable's calculations are built on six unreliable expert foundations provided by Mr. Stephen Dell (Sable's damages expert) and Dr. Tze Sing Eugene Ng (Sable's technical expert): (i) Mr. Dell includes foreign, non-infringing activity in his revenue estimates, (ii) Mr. Dell fails to reliably apportion Cloudflare's revenue to the relative value of the patented technology, (iii) Dr. Ng assumes, without evidence, that customers who do <u>not</u> use accused functionality nevertheless benefit from it, while Mr. Dell assumes that non-users value the patented functionality just as much as users do, (iv) Mr. Dell applies counterfactual profit margins, (v) Mr. Dell improperly seeks profit disgorgement in the guise of a royalty, and (vi) Mr. Dell does not base his hypothetical negotiation on the first date of infringement.

Each error, alone, renders Mr. Dell's royalty calculation unreliable. Together, they leave no doubt that the Court should not permit Mr. Dell to offer his damages opinions. Mr. Dell's errors compound at each step of his damages calculation, and, taken together, result in a grossly inflated reasonable-royalty calculation. For the reasons below, the Court should exclude Mr. Dell's and Dr. Ng's unreliable opinions along with Mr. Dell's resulting estimates of revenue, apportionment figure, apportioned revenue, profit margin, apportioned profit, and royalty payment.

## I.    STATEMENT OF FACTS

### A.    Cloudflare offers a wide variety of network, security, and developer-platform services for companies located around the world

Defendant Cloudflare is a "global cloud services provider that delivers a broad range of services to businesses of all sizes and in all geographies—making them more secure, enhancing the performance of their business-critical applications, and eliminating the cost and complexity of managing individual network hardware." Ex. A ¶ 35.

Cloudflare's website describes four categories of offered products: application services (Ex. H at 1-3), zero trust & SASE (Secure Access Service Edge) services (Ex. I at 1-2), network services (Ex. J at 1-2), and developer-platform services (Ex. K at 1-2). Dozens of products and features are listed in these four categories, including DNS services, DDoS protection, CDN services, bot mitigation, load balancing, zero-trust network access, Magic Transit, Magic WAN, Magic Firewall, and Workers. *Id.* at Exs. H at 1-2, Ex. I at 1, Ex. J at 1, Ex. K at 1.

### B.    Cloudflare's edge servers, located around the world, are built with commodity hardware and perform many functions

Cloudflare maintains a network of "edge servers," spanning the globe, to help "mak[e] the internet fast." Ex. C at 1; Ex. A ¶ 74. An edge server's "primary purpose" is "to store content as close as possible to a requesting client machine, thereby reducing latency and improving page load times." Ex. C at 1; *see also id.* at 2-3 ("By moving [content] as close as possible to the requesting client machine, an edge server cache is able to reduce the amount of time it takes for a web resource to load.") By placing edge servers in "key locations," Cloudflare's network can "quickly deliver content to users inside different networks." Ex. C at 2. Presently, Cloudflare houses its edge servers in data centers in approximately 300 cities around the world, with approximately 50 of those



data centers located in the United States. *See* Ex. E at 1, 5-19 (listing data centers); Ex. D (map with dots showing locations of data centers). The servers are built with "commodity hardware" sourced from multiple vendors. Ex. G at 3.

Sable claims that Cloudflare infringes four system claims of the '431 Patent and a single method claim of the '919 Patent. Sable, through its infringement expert, Dr. Ng, accuses Cloud-

flare's network of edge servers of infringing the '431 Patent, and Cloudflare's "transmitting of data over its network of edge servers, where the data is routed based on a corresponding quality of service, such as Argo for Packets or Magic Transit" of infringing the '919 Patent. Ex. B ¶¶ 114, 149; *see also* Ex. A ¶¶ 66-67.

Although Sable names Cloudflare's global network of edge servers as the Accused Products, Dr. Ng accuses precisely defined functionality that occurs on an edge server in one of Cloudflare's worldwide data centers. *See* Ex. B ¶ 88, Ex. F ¶ 16. Specifically, Dr. Ng claims that the edge servers' use of "L4Drop" meets the asserted claims of the '431 Patent, and that the edge servers' use of "Argo for Packets" and/or "Magic Transit" infringes the '919 Patent. Ex. B at ¶¶ 88, 114, 149-150. Dr. Ng explains this functionality at various portions of his report:



- **L4Drop.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  *Id.*; *id.* ¶ 135.

- **Magic Transit.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
  Ex. B ¶ 114.

- **Argo for Packets.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B ¶ 114.

Dr. Ng claims that "each and every Cloudflare edge server" performs the claimed infringing ac-

---

[1] The accused **Argo for Packets** feature, referenced by Dr. Ng, is different than Cloudflare's **Argo Smart Routing** product. Ex. W at 233:23-234:15, 235:8-236:3, 237:14-23, Ex. P at 6. Argo Smart Routing is often referred to as "Argo."

tivity. Ex. B ¶ 157.

L4Drop, Magic Transit, and Argo for Packets are just three of numerous functions per-formed by the edge servers.[2] *See* Ex. B ¶ 33 ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ L4Drop, Magic Transit, and Argo for Packets have nothing to do with the bulk of Cloudflare's products or features, such as CDN, Stream, and bot mitigation. *See* Ex. L (chart created by Cloudflare's technical expert, Dr. Min, showing doz-ens of Cloudflare products and features unrelated to Sable's patents).

### C.    Mr. Dell's reasonable-royalty calculation

In his report, Mr. Dell concludes that Sable and Cloudflare would agree to a lump sum of no less than ███████ to license the patents in a hypothetical negotiation. Ex. A ¶ 274. Mr. Dell claims a four-step process to reach that figure: Mr. Dell calculates (i) Cloudflare's **world-wide enterprise-customer revenue** as a base, (ii) **apportioned revenue** based on the patented features' purported contribution to Cloudflare's revenues, (iii) **apportioned profit** based on as-sumed profit margins, and, finally (iv) a **lump-sum royalty payment**, by discounting the appor-tioned profit to present value and assuming that Cloudflare would pay all such profits to Sable. Ex. A, attach. 3.

---

[2] For example, a Cloudflare internal document ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████. Ex. Q at 3-5.

1.    **Mr. Dell focuses on Cloudflare's "enterprise" customers**

Cloudflare's customers fall into three categories: free, pay-as-you-go (Pro or Business), and enterprise.[3] *See* Ex. H at 1, Ex. A ¶ 37 (paid plans limited to contracted [enterprise] and pay-as-you-go customers). Mr. Dell's damages theories focus solely on "enterprise" users. Ex. A ¶ 81 (because certain accused functionality is available only to enterprise customers, Mr. Dell considers only enterprise-customer revenue). Enterprise customers enter into contracts with Cloudflare specifying the products the customers may use. *See* Ex. W at 108:14-25; 123:10-20.

Cloudflare produced a large spreadsheet with information about its enterprise-customer contracts from 2015 to the present.[4] Mr. Dell relied extensively on this spreadsheet throughout his analysis. *See*, *e.g.*, Ex. A ¶ 21 (spreadsheet used to identify enterprise customers), ¶ 84 n. 143, ¶ 200 n. 283 (number of Magic Transit customers), attach. 4 n. 2 (geographic location of customers), attach. 14. The spreadsheet shows customer names, included products,[5] annual contract value, and the billing country. Garza Dec. ¶ 26, Ex. W at 153:22-156:25, 160:4-19, 169:14-19, 201:14-22, 211:8-15. For example, in the tab labeled ███████████████████



---

[3] Free customers benefit from some of Cloudflare's most powerful and popular tools at no cost whatsoever, including DDoS protection, CDN services, zero-trust network access, and Cloudflare Workers. Exs. H at 1-2, I at 1, K at 1-2. Pay-as-you-go users pay monthly for additional products and features, such as unlimited requests for Cloudflare Workers. Exs. H at 1-2, I at 1, K 1-2.

[4] CLOUDFLARE00039054; *see also* Ex. W at 108:14-21, 109:11-20 ████████████████ ████████████████████████████████████████████████ . Garza Dec. ¶ 27. In order that the Court may understand the type of information included in the spreadsheet, ████████████████ ████████████████████████████████████████████████ ██████████ Garza Dec. ¶ 27.

[5] ████████████████████████████████████████████████ Ex. W at 253:6-254:11.



████████████. Garza Dec. ¶ 27; Ex. O.

██. Garza Dec. ¶ 27.

███████. Garza Dec. ¶ 26; Ex. W at 200:9-18.

███████:

- ██████████████
- ██████████████
- ██████████████
- █████████. Ex. P at 16.
- █████████. Ex. P at 22-23.
- █████. Ex. P at 30.
- ██████████████



. *Id.*

- ████████████████████████████████████████████████████████████████████████████████████████████████. Ex. P at 38.

- ████████████████████████████████████████ Ex. P at 40.

- ████████████████████████████████████████████████████████████████████. Ex. P at 44.

- ████████████████████████. P at 49.

- ███████████. Ex. P at 46.

- ████████████████████████████████████████. Ex. P at 52.

- ███████████████████████████████████████. Ex. P at 55.

- █████████████████████████████ver. Ex. P at 57-58.

- ████████████████████████████████████████. Ex. P at 61.

Garza Dec. ¶ 28.

### 2.    Mr. Dell's royalty base includes *worldwide* enterprise-customer revenues attributable to *all* of Cloudflare's products

Mr. Dell begins by calculating a royalty base of ███████, which he asserts represents Cloudflare's enterprise-customer revenue. Ex. A ¶ 28. This figure (i) includes *all* of Cloudflare's revenue for its enterprise customers, Ex. A ¶ 83, (ii) does *not* account for whether the accused edge servers are inside or outside of the United States, Ex. A ¶¶ 79-80, and (iii) includes customers inside and outside of the United States. Mr. Dell also calculated an alternative revenue figure, ███████, which he asserts is based on enterprise customers based in the United States. Ex. A ¶ 80 n. 139. This figure, again, includes *all* revenue from these customers, and does not distinguish between edge-server activity occurring in the United States and activity occurring overseas.

### 3.    Mr. Dell claims that 20%-30% of Cloudflare's worldwide enterprise-customer revenue should be apportioned to patented features based on Magic Transit's and Argo for Packets' marginal improvements to "latency" and "packet loss."

Mr. Dell next claims to apportion 20% to 30% Cloudflare's revenue to "account for the features and benefits associated with the accused functionality," resulting in apportioned revenue of approximately ███████. Ex. A ¶ 107 & attach. 3.0.

Mr. Dell's apportionment adjustment is based on ███████████████
████████████████████████████████

■ ██████████████████████████████
████████████████████████████████
████████████

■ ████████████████████████████
████████████████████████

■ ████████████████████████████
████████████████████████████████
████████.



Mr. Dell also relied on Dr. Ng, who reviewed the same documents and concluded that (i) Magic Transit alone improves latency by 10%-36%, (ii) Argo for Packets improves latency by an additional 10%, which (iii) results in latency improvements of 19%-42.4% with the two products combined. Ex. A ¶¶ 98-99; Ex. B ¶¶ 281-282. Dr. Ng further concluded, without evidentiary support, that the use of Magic Transit and Argo for Packets by <u>some</u> customers provides benefits to <u>all</u> customers, without attempting to quantify or measure those alleged benefits. Ex. B ¶¶ 283-84.

Mr. Dell then opined that this evidence of technical <u>improvements</u> allegedly attributed to the patented technology should be directly translated into evidence of the <u>value</u> of the patented technology. Specifically, Mr. Dell stated that the quantified "<u>technical benefits</u>" shown by the above evidence are "relevant quantitative metrics for assessing the portion of <u>value</u> that would be representative of the apportionment considerations . . . ."[6] Ex. A ¶ 102-03; *see also id.* ¶ 104 (metrics are "useful benchmark" in determining "value that the patents at issue provide to the accused revenues"). Mr. Dell cites to Dr. Ng's quantified improvements to latency of 10-42%, for Magic Transit and Argo for Packets,[7] to conclude that "the incremental performance benefit from the patented technology at issue would range from **10%-40%**." Ex. A ¶ 105. Based on the

---

[6] Unless otherwise noted, in this motion, all emphases have been added.

[7] Ex. A ¶ 105 n. 167 (citing to Ex. B ¶¶ 281-282, ██████████████████████████████████████ ██████████████████████████████).

"consistency and clustering of the benefits range within the 10% to 40% range," Mr. Dell concluded that **20%-30%** of Cloudflare's worldwide enterprise-customer revenue base was "directly tied to the economic benefits attributable to the patents at issue." Ex. A ¶ 106.

> ### 4. Even though Cloudflare has never been profitable, Mr. Dell applies hypothetical profit margins to calculate robust apportioned profits

Mr. Dell claims that, from the apportioned revenue he obtained by applying the 20-30% figure discussed above, Cloudflare should " ███████████████████████████████ ███████████████████████████████████████████ Ex. A ¶ 28, attach. 3. Mr. Dell's assumed profit margins ███████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████

> ### 5. Mr. Dell claims that *all* of the apportioned profits constitute a reasonable royalty

After examining the *Georgia-Pacific* factors, Mr. Dell predicts the outcome of a hypothetical negotiation between Sable and Cloudflare occurring in August 2019. Ex. A ¶ 251. Mr. Dell opines that Cloudflare would have paid Sable <u>100%</u> of the apportioned profit that Mr. Dell calculated, discounted to the date of the hypothetical negotiation, in exchange for a non-exclusive right to practice the asserted claims within the United States. Ex. A attach. 3 (labeling the discounted apportioned profit as "discounted **royalty payment**"); Ex. A ¶ 269 (range of discounted apportioned profits ████████████████████); Ex. A ¶ 270 (range of applicable lump sum royalty payments of ████████████████); Ex. A ¶ 255.

## II.    LEGAL BACKGROUND

Expert testimony must be "scientifically reliable and relevant." *Daedalus Blue LLC v. SZ DJI Tech. Co.*, No. 20-73-ADA, 2022 WL 831619 at *3 (W.D. Tex. Feb. 24, 2022). District

courts may exclude evidence that is "based upon unreliable principles or methods, legally insuf-

ficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts

of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015).

"[B]oth unsound methods and unjustified extrapolations from existing data can require the Court

to exclude an expert." *ProTradeNet, LLC v. Predictive Profiles, Inc.*, No. 18-38-ADA, 2019 WL

6499488, at *2 (W.D. Tex. Oct. 11, 2019). Sable has the burden of establishing the reliability

and relevance of its experts' opinions. *See Paz v. Brush Eng'd Mat'ls, Inc.*, 555 F.3d 383, 388

(5th Cir. 2009).

Here, Sable must provide "evidence tending to separate or apportion [Cloudflare's] prof-

its and [Sable's] damages between the patented feature and the unpatented features . . . [unless]

the entire value of the whole machine, as a marketable article, is properly and legally attributable

to the patented feature." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Accordingly, Sable must

"carefully tie proof of damages to the claimed invention's footprint in the market place."

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010); *Ericsson, Inc. v. D-Link

Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (royalty must be based on the "incremental" value of

patented invention to end product); *C.S.I.R.O. v. Cisco Sys.*, 809 F.3d 1295 (Fed. Cir. 2015).

## III.    ARGUMENT

### A.    Mr. Dell did not exclude Cloudflare's overseas activity, which cannot in-fringe United States patents as a matter of law, rendering all of his calculations un-reliable

Sable accuses Cloudflare's network of edge servers, which are deployed all around the

globe, as infringing. Ex. A ¶ 36 (over 100 countries). Sable's infringement theories are based on

the *use* of those edge servers in an allegedly infringing fashion, specifically, when the servers

implement L4Drop, Magic Transit, or Argo for Packets. Ex. B at ¶¶ 88, 114, 149, 150.

Mr. Dell's damages analysis must carve out extraterritorial use of the technology, be-

cause U.S. patent laws do not "provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all." *Power Integrations, Inc. v. Fairchild Semicond. Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013).[8] Under the theories expressed by Dr. Ng and Mr. Dell, each of Cloudflare's edge servers separately infringe the patents in the exact same way, Ex. B ¶¶ 156-57, and because the servers are located in over 100 countries, Ex. E at 5-19, some of the accused infringement happens in the United States, and some happens overseas. Dr. Ng states ████████████████████████████████████████████████████████

████████████████████████████████. Ex. B ¶¶ 97-98, 127. Thus, when a domestic edge server implements L4Drop, Sable may potentially recover damages, but Cloudflare's use of L4Drop overseas is "not infringement at all," and cannot support damages. *Power Integrations*, 711 F.3d at 1371. Dr. Ng's analysis of Magic Transit and Argo for Packets similarly points to software modules and hardware components at a single edge server (outlined in red at ¶¶ 172, 175, 214-15). Ex. B ¶¶ 172, 175, 207, 214-16, 251-52, 263 (*see also id.* ¶¶ 176, 184-185, 197, 203, 208-09, 244, 256-57, 261). Even if an overseas edge server implements Magic Transit or Argo for Packets exactly as Dr. Ng claims, it will not support a claim for United States patent infringement. *Power Integrations*, 711 F.3d at 1371. As a result, potential infringement occurs **only** when a United States edge server implements L4Drop, Magic Transit, or Argo for Packets. Cloudflare's implementation of L4Drop, Magic Transit, or Argo for Packets overseas cannot infringe any United States patents. *Id.*

Mr. Dell nevertheless claims that Cloudflare's <u>worldwide</u> revenues are subject to <u>United</u>

---

[8] *See also WesternGeco LLC v. ION Geophysical Corp.*, 791 F.3d 1340, 1350-51 (Fed. Cir. 2015) (same); *Deepsouth Packing Co. v. Latiram Corp.*, 406 U.S. 518, 531 (1972) ("To the degree that the inventor needs protection in markets other than those of this country, the wording of [the patent statute] reveals a congressional intent to have him seek it abroad through patents secured in the countries where his goods are being used.").

States patent law because "all data traffic is routed through every Cloudflare server globally." Ex. A ¶ 29 n. 30. Mr. Dell's report shows, however, that this is not his *opinion* – he was told by *Sable's counsel* that he should consider <u>worldwide</u> data traffic as infringing the patents.[9] Sable's counsel misstates the law. "Connection" to the United States does not suffice to bring foreign activity under the ambit of U.S. patent law. *Power Integrations*, 711 F.3d at 1371-72 (quoting *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247 (2010) ("But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.")). Instead, as here, exterritorial use of an invention "cuts off the chain of causation," insulating that activity from U.S. patent law. *Power Integrations*, 711 F.3d at 1371-72.

Here, the claimed infringing activity (Cloudflare's edge servers' use of L4Drop, Magic Transit, and Argo for Packets) occurs at edge servers at approximately 50 domestic data centers and approximately 250 foreign data centers. By using *worldwide* customer revenue, Sable and Mr. Dell effectively treat *all* of Cloudflare's accused activity as occurring in the United States and subject to U.S patent law. This is legal error under *Power Integrations*, *WesternGeco*, and *Deepsouth*. This error—an overinflated royalty base that includes revenues attributable to foreign activity—infects Mr. Dell's intermediate and bottom-line royalty opinions. Because the revenues are overinflated, so too are Mr. Dell's apportioned revenues, apportioned profits, and the resulting royalty. The Court should exclude each of these opinions because Mr. Dell treated Cloud-

---

[9] Ex. A ¶ 79 ("Therefore, based on the evidence above, I understand from counsel for Sable that all data traffic served through Cloudflare's accused network on of edge servers asserted to infringe the Asserted Patents would be directly connected to the United States in one way or another and therefore subject to United States patent laws."); *see also* Ex. A ¶ 80 ("I have been asked [presumably, by Sable's counsel] to include *worldwide* revenues generated by Cloudflare . . ."). Further, Mr. Dell is a valuation consultant, not a technical expert, and is not qualified to opine as to whether the accused data traffic "routes through every Cloudflare server globally."

flare's worldwide activity as if it had occurred within the United States.

Perhaps anticipating the extraterritoriality issue, Mr. Dell also calculated revenues "generated by Cloudflare for customers identified as U.S. customers" to be used "[t]o the extent that it is determined . . . that Cloudflare's revenues generated from customers only located in the United States is the applicable royalty base." Ex. A ¶ 80 n. 139. This analysis also misses the mark. *Power Integrations* requires Sable and Mr. Dell to exclude non-United States *activity*, no matter the location of the customer. When a United Kingdom user accesses an edge server in London, the foreign edge-server activity *cannot infringe* Sable's U.S. patents, *Power Integrations*, 711 F.3d at 1371, and cannot support damages here, no matter the location of Cloudflare's customer. Conversely, when a user connects through a Dallas edge server, that domestic edge-server activity is subject to United States patent laws, whether the paying customer is from Florida or France. In other words, restricting the royalty base to U.S. customers (rather than U.S. edge-server activity) both (i) overstates potentially infringing activity (by treating overseas edge-server activity attributable to U.S. customers as infringing), and (ii) understates potentially infringing activity (by treating domestic edge-server activity attributable to foreign customers as non-infringing). As a result, Mr. Dell's calculation does not reliably calculate the revenue attributable to domestic accused activity, and the Court should exclude his calculation and resulting opinions.

In short, Mr. Dell's revenue base sweeps in revenue resulting from edge-server activity in 250 foreign data centers—activity insulated from Sable's infringement claims. *Power Integrations*, 711 F.3d at 1371. Because the Federal Circuit prohibits patent damages based on foreign activity, the Court should exclude Mr. Dell's damages opinions as unreliable.

### B.    Mr. Dell's apportionment methodology is unreliable

Even had Mr. Dell properly limited his royalty base to domestic activity (he did not), Mr.

Dell failed to reliably apportion Cloudflare's revenues to capture only revenue attributable to features allegedly embodying the patented technology.

In patent cases, "apportionment" refers to plaintiff's burden to "separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Garretson*, 111 U.S. at 121; *see generally C.S.I.R.O*, 809 F.3d at 1301-02.[10] Apportionment is "the governing rule" "where multi-component products are involved." *Ericsson*, 773 F.3d at 1226. Consequently, to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014).

Under apportionment principles, courts require plaintiffs to use the "smallest saleable patent-practicing unit" as the royalty base. *C.S.I.R.O.*, 809 F.3d at 1301; *Virnetx*, 767 F.3d at 1333 ("[A] patentee may not balance out an unreasonably high royalty base simply by asserting a low enough royalty rate."). But "[w]here the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . ., the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." *Virnetx*, 767 F.3d at 1327. Instead, if the smallest saleable unit still contains significant unpatented features, the patentee must apportion still further down to a smaller, "patent-practicing unit" of the accused product. *Id.*

Here, Mr. Dell's royalty base encompasses *all* revenue from enterprise customers, and thus reflects *all* Cloudflare services provided to its enterprise customers. For apportionment pur-

---

[10] There are two justifications for the apportionment principle. First, "where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *C.S.I.R.O.*, 809 F.3d at 1302. Second is the "important evidentiary principle" that "care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product." *Id.*

poses, Mr. Dell had to separate the value of the accused features from the value of all other features. In other words, Mr. Dell needed to determine how much of Cloudflare's revenue is attributable to the accused infringing functionality (L4Drop for the '431 Patent, Magic Transit and Argo for Packets the '919 Patent), and how much of Cloudflare's revenue is attributable to the non-accused products and features provided to enterprise customers.

### 1. Mr. Dell's focus on <u>improvements</u> to latency and packet dropping does not reliability apportion Cloudflare revenue between the value of the allegedly infringing features and the value of the other products and services provided to Cloudflare's enterprise customers

Mr. Dell does not claim that the entire value of Cloudflare's services are attributable to the patented technology; instead, Mr. Dell ultimately concluded that **20%-30%** of the value of Cloudflare's worldwide enterprise-customer revenue should be attributed to the patented technology. But the <u>only</u> quantitative support Mr. Dell cites for this conclusion are ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. Ex. A ¶¶ 87-107, 256.[11] Mr. Dell concludes that the "quantitative **technical benefits**" are "relevant quantitative metrics for assessing the portion of <u>**value**</u> that would be representative of the apportionment considerations . . . ." Ex. A ¶¶ 102-03; *see also id.* ¶ 104 (metrics are "useful benchmark" in determining "value that the patents at issue provide to the accused revenues."). This is not true. As explained in more detail below, showing that a product's feature (such as latency) has *improved* by 20%, 30%, or 90% does nothing to show (and is an unreliable way of determining) whether that feature is *worth*

---

[11] Mr. Dell cites Dr. Ng's report to support the statement that "████████████████████████████ Ex. A ¶ 105. But the sections of Dr. Ng's report cited for that proposition (¶¶ 281-82) relate ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████        ████████████████████████████████████

20%, 30%, or 90% of the product's revenue. The Court should thus exclude Mr. Dell's opinion that the measured decrease in latency and packet dropping is a relevant quantitative metric for assessing the value of the accused products. Because Mr. Dell provided no other basis to conclude that the patented features account for 20%-30% of Cloudflare's worldwide revenues, the Court should exclude Mr. Dell's apportionment analysis, and his resulting damages estimates, in their entirety.

As noted above, *see supra* § III(A), Mr. Dell chose Cloudflare's worldwide enterprise-customer revenue as his royalty base. That revenue is based on dozens of products marketed and sold to enterprise customers, and each of these products provides its own functionality and benefits.[12] In this way, Cloudflare's accused enterprise revenue is similar to revenue attributable to a smartphone or a car, each of which also provides dozens of functions to its users:

- A smartphone takes pictures, displays data, makes calls, sends e-mails and texts, controls access to the phone, vibrates, manages its battery power, identifies location, and connects to wi-fi, among many other functions.

- A car accelerates, brakes, turns, illuminates the road, plays music, displays maps, transmits back-up-camera video, and air conditions the interior, among many other functions.

- Depending on the products purchased by each enterprise customer, the accused enterprise revenue provides DNS services, CDN services, and a web-application firewall; mitigates bots; allows access to Cloudflare's China network; implements zero-trust network access; resizes images; streams video; and provides Magic Transit, Magic Firewall, and Argo for Packets; among many other functions.

Showing a *quantified improvement* to any single function does <u>nothing</u> to show that improvement's relative value to the whole. For example,

- There is no reason to think that technology that connects a call 70% faster is

---

[12] *See supra* § I(C)(1) (████████████████████████████████████████████████████ ███████████████████████████████████); Ex. F ¶ 203 & Ex. L (summary of products and features gathered by Cloudflare's technical expert); Ex. E at 1-4 (operational status of dozens of Cloudflare services); Ex. H-K (website touting dozens of products, features, and benefits).

worth 70% of a smartphone, or that increasing a smartphone's camera megapixels by 50% is worth 50% of a smartphone, or that technology that vibrates the phone 5% faster (or slower) is worth 5% of a smartphone.

- There is no reason to think that technology that increases the brightness of head-lights by a third is worth a third of the car, technology that shortens the time required to accelerate from 0-60 miles per hour by 20% is worth 20% of the car, or that an 80% more efficient air-conditioning system is worth 80% of the car.

- In the same vein, showing a 10-42% decrease in latency for Cloudflare customers using two features (Magic Transit and Argo for Packets) does not support a finding that the improvement is worth 10-42% of Cloudflare's worldwide enterprise-customer revenue. Likewise, evidence showing a 90% reduction in packet dropping does not support a finding that the technology is worth 90% of Cloudflare's worldwide revenue.

In short, one cannot estimate the relative *value* of an improvement by quantifying the improvement in a single feature of the product.

Instead, the value of improved technology depends on the context of the product and the needs of the market. For example, for high-frequency stock traders, increasing trading speed by 2% could be worth hundreds of millions of dollars. Conversely, increasing the speed of processes that are already sufficiently fast—like increasing, by 50%, the speed a lamp turns on after you flip the switch—is worth close to nothing. Relevant factors to determine the relative value of an improved technology could include, for example, what percentage of customers care at all about the feature at issue, how important the claimed increase is to the feature at issue, marketplace response to the improved feature, and the value of the non-patented features. Here, Mr. Dell did not analyze enterprise customers' willingness to pay for reduced latency, reduced packet dropping, or Cloudflare products containing such improvements, nor did Mr. Dell analyze the importance or worth of those features and products to enterprise customers. Mr. Dell thus cannot reliably conclude that the reduction in latency and packet dropping identified by Dr. Ng accounts for 20-30% of revenue.

In sum, the Court should exclude Mr. Dell's opinion that measured technical benefits

(such as a 10%-42% reduction in latency) are "relevant quantitative metrics for assessing the portion of value that would be representative of the apportionment considerations[.]" Ex. A ¶¶ 102-03, *see also id.* ¶ 104. Without this opinion, Mr. Dell's apportionment analysis cannot stand. Experts cannot "pluck" damages figures "from thin air." *See Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299, 1312 (Fed. Cir. 2018). Instead, Mr. Dell had to identify a reliable basis in fact supporting his conclusions. After excluding Mr. Dell's reliance on packet-dropping and latency improvements, Mr. Dell points to no data or figures showing that 20%-30% of Cloudflare's worldwide revenue is attributable to the accused functionality. The Court should thus exclude Mr. Dell's apportionment opinions, and his follow-on royalty analysis, in their entirety.

### 2. Mr. Dell's apportionment analysis is independently unreliable because it does not identify, separate out, and value the unpatented features

Mr. Dell's apportionment opinion is unreliable for a second, independent reason—Mr. Dell's apportionment opinion does not consider the value of indisputably unpatented features in reaching his 20%-30% apportionment figure.

Mr. Dell's apportionment figure implicitly compares the value of the alleged patented features and the unpatented features. By assuming that 20%-30% of Cloudflare's worldwide revenue is attributable to the patented improvement, by default, Mr. Dell necessarily assumes that 70%-80% of the revenue (the balance) is attributable to non-patented features and products. In math terms, the apportionment figure (AF) is:

$$AF = \frac{Value\ of\ patented\ features}{Value\ of\ patented\ features + Value\ of\ non-infringing\ features}$$

Because this is a *relative* figure, the value cannot be calculated without considering the value of the non-patented features. For example, the apportionment figure for improvements to GPS technology would be higher for a GPS device (fewer valuable non-infringing features) than for a smartphone or a car (with many valuable non-infringing features). If an expert calculated that

40% of a GPS device's revenue were due to improvements to GPS technology, that 40% figure would not apply to a smartphone or a car—the massive *increase* in value of the non-infringing features would *decrease* the relative value of the patented technology (i.e., the apportionment figure). In math terms, as the value of the non-infringing features increases (the denominator), the apportionment figure decreases:

$$(\downarrow)AF = \frac{Value\ of\ patented\ features}{Value\ of\ patented\ features + (\uparrow)Value\ of\ non-infringing\ features}$$

In other words, Mr. Dell cannot reliably determine an apportionment figure without *comparing* the values of the infringing and non-infringing features, which requires analyzing the value of the non-infringing features.

In his report, Mr. Dell did not even attempt to *identify* (much less value) the non-infringing products and features that are encompassed by enterprise-customer revenue. The enterprise-customer contract spreadsheet ███████████████████████████████████

███████████████████████████████████████████████████████

███████████, *see supra* § I(C)(1) (███████████████████████████████

███████████████████),[13] Garza Dec. ¶ 28, Ex. O. Mr. Dell's report did not analyze the products included in each contract entry.[14] Further, Mr. Dell claims to have reviewed the

---

[13] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[14] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

sales and marketing information on Cloudflare's website, Ex. A ¶ 73, which would have alerted him to Cloudflare's diverse suite of products and features, Exs. H-K (website showing lists of products and features). Finally, Mr. Dell fails to identify the features that drive Cloudflare's marketing of its products to enterprise customers, including (i) Cloudflare's massive network scale in over 300 cities and 100 countries, (ii) its platform's "ease of use" and enterprise-guided onboarding and training, (iii) integrated security and performance, with unified layered security across all endpoints and users, (iv) award winning, global, 24/7/365 email and emergency phone support, (v) 100% uptime reliability, and (vi) a developer-friendly platform, allowing developers to create or augment applications without configuring or maintaining infrastructure. Ex. J at 2. Without identifying these non-infringing features, products, and benefits, Mr. Dell cannot hope to value those features, products, and benefits or reliably calculate an apportionment figure.

In sum, Mr. Dell calculated a 20-30% apportionment figure *without* identifying, separating out, or attempting to value the non-infringing products and features that contribute to Cloudflare's worldwide enterprise revenue, even though the apportionment figure directly depends on the value of those non-infringing products and features. Without knowing whether the non-infringing features are relatively valuable (like the car or a smartphone discussed above) or relatively lacking value (like the GPS device discussed above), Mr. Dell cannot know if he has overstated the relative value of the accused features, nor can he reliably calculate the share of Cloudflare's revenue that is attributable to the patented technology. Because Mr. Dell has not considered the value of Cloudflare's non-infringing features in his apportionment analysis at all, his

calculation of a 20%-30% apportionment figure (which purports to reflect the value the patents-in-suit contribute to Cloudflare's enterprise revenue) is unreliable.

> **3.      Additionally, Mr. Dell has provided no reliable basis to extend his 20%-30% apportionment figure, based on quantified improvements for users of Magic Transit and Argo for Packets, to revenue from enterprise customers that do not use Magic Transit or Argo for Packets.**

Additionally, even if Mr. Dell's reliance on the 20%-30% apportionment figure were proper (and it is not), the Court should nevertheless exclude his opinion that the same factor applies to *all* enterprise users and *all* revenue, including revenue generated from enterprise customers that do not contract for or use Magic Transit or Argo for Packets.

The contracts spreadsheet used by Mr. Dell shows ███████████████████ ████████████████████████████ █████████████████████████████████████. Garza Dec. ¶ 29, Ex. W at 241:2-15, 253:6-254:11. Mr. Dell nevertheless concludes, based on his understanding of Dr. Ng's opinion, that <u>all</u> Cloudflare customers benefit from these products— "Cloudflare can reduce network congestion for all Cloudflare customers by moving traffic for selected customers to certain lanes thereby reducing traffic/congestion for customers on other lanes." Ex. A ¶ 209, Ex. B ¶¶ 283-84. Even if this *qualitative* opinion is taken at face value, neither Dr. Ng nor Mr. Dell provide any evidence of the *quantitative* reduction in latency and/or packet-dropping for customers that do not use Magic Transit or Argo for Packets.

Mr. Dell must compare the value of the actual benefit for non-users of Magic Transit and Argo for Packets (an unmeasured reduction in network congestion), with the value of the unpatented, non-infringing products and features received from Cloudflare. *VirnetX*, 767 F.3d at 1329. Inexplicably, Mr. Dell applies the <u>same</u> 20-30% apportionment figure to revenue generated from

---

[15] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Garza Dec. ¶ 29.

both (i) customers who are willing to pay for Magic Transit and Argo for Packets and (as a result) experience a 10-42% reduction in latency and a 90% reduction in packet dropping, and (ii) customers that are not willing to pay for these services and <u>do not receive</u> the claimed 10-42% reduction in latency or 90% reduction in packet dropping, but instead allegedly receive some unmeasured, unquantified benefit from "reduce[d] network congestion" (Ex. A ¶ 209). This makes no sense. Customers who are willing to pay for (and receive) the benefits of the accused services value them more than customers who are not willing to pay for (and do not receive) the same benefits. The apportionment figure for non-users of Argo for Packets or Magic Transit must be <u>lower</u> than the figure calculated for customers that pay for those services. Further, if the non-users place no value on the alleged "reduced network congestion" caused by other customers' use of Magic Transit and Argo for Packets, the apportionment factor for non-user revenue should approach zero—in that case, the revenue Cloudflare receives from non-users would flow from non-infringing products and features.

To reliably apportion revenue for non-users, Mr. Dell must compare the values of (i) a qualitative, unmeasured benefit due to alleged reduced network congestion for customers that do not use Magic Transit or Argo for Packets and (ii) the non-infringing features used by these customers. Mr. Dell does neither. Mr. Dell does not identify evidence that (i) shows the value of reduced network congestion for these customers (e.g., estimates how much a customer would pay for the reduced network congestion caused by other customers using Argo for Packets and Magic Transit) or (ii) quantifies the benefits of reduced network to these customers (e.g., calculates a reduction in latency for customers that do not pay for or use Magic Transit or Argo for Packets). And as noted in the prior section, Mr. Dell's report makes no effort to value non-infringing products and features at all. As a result, the Court should exclude, as unreliable, Mr. Dell's opinion

that the patented technology accounts for 20%-30% of revenue from enterprise customers that do not use Magic Transit or Argo for Packets.

> **4.    Further, Mr. Dell has provided no reliable basis to extend his 20-30% apportionment figure, based on improvements for users of Magic Transit and Argo for Packets, to L4Drop.**

Even if Mr. Dell's reliance on his 20-30% apportionment factor were proper (as discussed above, it is not), the Court should nevertheless exclude his opinion that the factor equally applies to L4Drop or the '431 patent.

Dr. Ng's infringement analysis for the '431 patent is based on L4Drop functionality. *See* Ex. B ¶¶ 99, 114, 121-22, 127, 129-31, 135, 140, 144. None of the infringement analysis relies on Magic Transit, or Argo for Packets. *See* Ex. B ¶¶ 115-148. Conversely, Dr. Ng's infringement analysis for the '919 patent is based on Magic Transit and Argo for Packets. Ex. B ¶¶ 150, 153-55, 158-166, 173-176, 180-183, 197, 199, 201, 203-208, 214-221, 223-226, 231-236, 245-254, 261, 263-64. ███████████████████████████████████████████████████████

███████████████████, Ex. B ¶ 176, L4Drop is not identified as performing the patented steps for the '919 patent, Ex. B ¶¶ 150-265. In short, Dr. Ng explains how L4Drop infringes the '431 Patent, but not the '919 patent. Dr. Ng also explains how Magic Transit and Argo for Packets infringe the '919 patent, but not the '431 patent. Dr. Ng thus admits that the functionality of L4Drop, on one hand, and Magic Transit and Argo for Packets, on the other, are *different*—they use the technology of different patents.

Because L4Drop uses different technology from a different patent, Mr. Dell cannot recycle his apportionment analysis using evidence for Magic Transit and Argo for Packets. Further, Mr. Dell has provided no evidence showing that Cloudflare's enterprise customers value the technologies of the '431 and '919 patents identically.

To reliably apportion revenue for the '431 Patent, Mr. Dell must compare the values of

(i) benefits stemming from L4Drop for Cloudflare's enterprise customers[16] and (ii) the non-infringing features used by these customers. Mr. Dell does neither. Mr. Dell does not identify evidence that quantifies or values the benefits of L4Drop whatsoever.[17] And as noted in the prior two sections, Mr. Dell's report makes no effort to value non-infringing products and benefits used by Cloudflare's enterprise customers. The Court should thus exclude Mr. Dell's apportionment analysis and conclusions for the '431 Patent and L4Drop.

###    C.    Dr. Ng has not reliably supported his claim that customers who do not use Magic Transit and Argo for Packets receive a better experience, further rendering Mr. Dell's apportionment analysis unreliable

Dr. Ng proposes that the use Argo for Packets and/or Magic Transit by <u>some</u> customers results in unquantified benefits for <u>all</u> customers. Ex. B ¶ 283-84 ("By leveraging technologies that practice the claimed inventions of the patents-in-suit, it is my opinion that Cloudflare is able to provide a better experience for all Cloudflare customers using its network of edge servers."). Importantly, Dr. Ng cites to no evidence or documents showing improvements (to latency, congestion, or otherwise) for customers who do not use Magic Transit or Argo for Packets—in particular, no documents or evidence support a finding that the use of Magic Transit or Argo for Packets by some customers improves the experience for all customers, nor do any documents or testing attempt to quantify any alleged improvement in latency for customers that do not use Magic Transit or Argo for Packets. Further, no evidence suggests that the ██ enterprise customers using Argo for Packets results in any sort of network-wide benefit.

Although Dr. Ng's hypothesis (that <u>all</u> customers benefit when <u>some</u> customers use Mag-

---

[16] Dr. Ng opined ██████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. N at 38:17-39:13. Mr. Dell does not address or value these identified benefits of L4Drop in his report.

[17] In the portion of his report evaluating the benefits of the patented technology, Dr. Ng solely considers evidence relating to Magic Transit and Argo for Packets. Ex. B ¶¶ 272-285.

ic Transit or Argo for Packets) is *testable*, it has not been tested. In lieu of evidence, Dr. Ng re-lies on a traffic analogy—that moving fast-moving traffic to its own lane provides a better over-all experience for all drivers on the road.[18] This analogy is not evidence. Dr. Ng has not estab-lished that signals moving along wired and wireless networks behave anything like automobiles and trucks moving along a road network, how the concept a "lane of traffic" applies in a network scenario, or that congestion is caused and addressed in similar ways—for example, does a faulty data packet, like a broken-down vehicle, block a "lane" for all incoming traffic until it is ad-dressed? Without an empirical foundation showing that his "lanes of traffic" analogy accurately reflects the activity on Cloudflare's network, Dr. Ng's opinion is unreliable and the Court should exclude it. *See Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (expert's causation hy-pothesis excluded for lack of empirical foundation); *Huss v. Gayden*, 571 F.3d 442, 458-59 (5th Cir. 2009) (proposed analogy between Terbutaline and other drugs in the same family (including cocaine) insufficient to establish a scientifically valid causation theory under *Daubert*).

Further, even if Dr. Ng's analogy could serve as evidence (and it cannot), the analogy does not reliably lead to his proposed conclusion. Often, in the world of cars and trucks, separat-ing out high-priority traffic *clogs* the road network for everyone else. For example, when a head of state comes to town, the police reserve a path through a city for their motorcade, stymying daily commutes. When a high-priority ambulance approaches normal traffic, Texas law requires vehicles to move aside and yield the roadway. Despite Dr. Ng's assumption to the contrary, in the car-and-truck context, the fact that some traffic is designated high-priority does not always

---

[18] Ex. B ¶ 283 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.")

lead to quicker commutes for everyone. In the same vein, Dr. Ng does not address whether Cloudflare's system (i) reserves existing system paths as "high-priority traffic only," (like reserving a path for a head of state) reducing the available paths for other customers, leading to an increase in latency, unreliability, and congestion for lower-priority traffic, or (ii) implements rules requiring lower-priority traffic to yield to higher-priority traffic (like requiring cars to yield to ambulances), leading to increases in latency and congestion for lower-priority traffic. If Dr. Ng insists that data-network traffic works like car-and-truck traffic, there is no reliable basis to discount either of these possibilities.

To reliably reach his conclusion, Dr. Ng would need to review tests determining whether non-user traffic measurably improves when a small percentage of customers use Magic Transit and/or Argo for Packets. Dr. Ng's traffic analogy does not reliably show improvement for non-users. As such, the Court should exclude Dr. Ng's opinion (expressed at Ex. B ¶ 283-84) that the use of Magic Transit and Argo for Packets by some Cloudflare customers results in benefits for all Cloudflare customers.

### 1. If the Court strikes Dr. Ng's opinion, Mr. Dell's apportionment analysis must be excluded because he failed to restrict revenue to the smallest salable unit

Without Dr. Ng's unreliable opinion extending the benefits of Magic Transit and Argo for Packets to enterprise customers who do not use those services, there is no basis for Mr. Dell's royalty base to include Cloudflare customer revenue that has nothing to do with the claimed infringement. Under smallest-salable-unit principles, Mr. Dell must exclude this non-infringing revenue before applying apportionment factors and royalty rates. *C.S.I.R.O.*, 809 F.3d at 1301-02; *Virnetx*, 767 F.3d at 1329. For the '919 patent, Mr. Dell must (i) exclude all revenue from enterprise customers who do not use Magic Transit or Argo for Packets, and (ii) determine the portion of remaining revenue attributable to the '919 patent. Mr. Dell must do the same for the

'431 patent, identifying and beginning with the smallest "patent-practicing unit" of that technology. *Virnetx*, 767 F.3d at 1327. Because Mr. Dell's apportionment analysis begins with all of Cloudflare's worldwide enterprise-customer revenue, rather than only enterprise customers using the patented technology, the analysis does not conform with *C.S.I.R.O.* and *Virnetx* and must be excluded.

### D.    Mr. Dell's calculation of Cloudflare's apportioned profits is unreliable

Despite acknowledging that Cloudflare has never been profitable, ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████).

Neither end of the profit-margin range reliably estimates apportioned profit. ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. As such, Mr. Dell cannot reliably use this figure to estimate profits. Further, Mr. Dell's "normalization" procedure assumes that the parties to a hypothetical negotiation would ignore Cloudflare's historical unprofitability in favor of counterfactual, positive profit margins unmoored to Cloudflare's actual expenses. The Court should exclude both profit-margin estimates as products of unreliable methods and reasoning.

1.    **The 42% "Unit Economic Margin" is not a profit margin, and cannot reliably calculate apportioned profit**

Mr. Dell pulled the 42% figure from the following Cloudflare PowerPoint slide:



Ex. A ¶ 195, 242. Mr. Dell applies this figure as a *profit margin*—he multiplies his apportioned revenue range ███████████████ by 42% to calculate apportioned profits (█████████████ ██. Ex. A attach. 3, p. 2.

Cloudflare does not characterize this figure as a *profit* margin, but as a *unit economic margin*—███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████.

Cloudflare's FY2022 10-K separated out Cloudflare's expenses into four categories: costs of revenue (around $230 million), sales and marketing ($465 million), research and devel-

opment ($300 million) and general and administrative expenses ($180 million). Ex. M; *see* Ex. W at 251:6-16. Even with revenues of around $1 billion, costs exceeded revenues by around $200 million (i.e., Cloudflare had a *negative* profit of $200 million), Ex. M, resulting in a profit margin of around negative 20%. In tabular format:

|  | FY2022, Ex. M | Costs/Profit as a Percentage of Revenue |
|---|---|---|
| Revenue | $975 million |  |
| Cost of Revenue | $233 million | 24% |
| Sales and marketing | $466 million | 48% |
| Research and development | $298 million | 31% |
| General and administrative | $180 million | 18% |
| Total costs | $1.18 billion | 121% |
| Revenue – costs (Profit) | -$205 million | Actual profit margin: **-21%** |

Ex. M. Mr. Dell admits that Cloudflare's company-wide margins (negative 21% for FY2022) "provide a reasonable estimate and appropriate measure of the profitability of the Accused Products." Ex. A ¶ 193.

Mr. Dell recreates Cloudflare's UEM for several years. Ex. A attach. 5.3. Mr. Dell's analysis shows that UEM discounts Cloudflare's reported expenses in two critical ways. ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████

In other words, as shown in the table below, Mr. Dell calculates a positive UEM by reducing or removing two categories of reported costs (which, of course, increases profits):

|  | 10-K Reported Costs/Profit as a Percentage of Revenue | |
| --- | --- | --- |
| Revenue | | |
| Cost of Revenue | 24% | |
| Sales and marketing | 48% | |
| Research and development | 31% | |
| General and administrative | 18% | |
| Total costs | 121% | |
| Revenue – costs (Profit) | Actual profit margin: **-21%** | |

Ex. M, Ex. A attach. 5.3. ███████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ .

    Mr. Dell nevertheless claims, without any evidentiary support, that Cloudflare would

consider UEM ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████." Ex. A ¶ 197. There is

no support for this leap in reasoning. ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. Ex. A ¶ 197. Because Mr.

Dell provides no empirical basis for this opinion, the Court should exclude it as unreliable.

    ███████████████████████████████████████████████ thus cannot be

used to reliably calculate Cloudflare's profits. The Court should thus exclude Mr. Dell's opinion

that Cloudflare's profit margin reaches as high as 42% and his calculations of apportioned profit

based on his UEM.

### 2.    Mr. Dell's "normalization" does not reliably estimate profit

    Mr. Dell's other profit-margin calculation reduces Cloudflare's reported sales, marketing,

general, and administrative expenses, "normalizing" those expenses based on the reported results

of Cloudflare's competitors. The results are drastic—Mr. Dell claims that even though Cloudflare's actual profit margin runs between negative 20% to negative 46% between FY2018-22, the parties to a hypothetical negotiation would set these actual results aside and assume a positive profit margin of 14-17% instead. *Compare* Ex. A ¶ 191 Fig. 4 *with* ¶ 240, Fig. 7. The Court should exclude these counterfactual profit margins because Mr. Dell failed to (i) justify replacing Cloudflare's reported expenses with other companies' reported expenses, (ii) reduce Cloudflare's revenue to reflect the assumed reduced investment, and (iii) adjust for the effect of business size.

As noted above, Cloudflare reports four types of expenses—cost of revenue, sales and marketing, research and development, and general and administrative. Ex. M. Mr. Dell noted that Cloudflare spends more on two categories of expenses than its competitors. Mr. Dell "normalized" those expenses by *replacing* Cloudflare's reported expense figures with *averaged* expense figures from multiple Cloudflare competitors. For example, for FY2022, Cloudflare's sales and marketing expenses were reported as 48% of revenue. Mr. Dell calculated that the sales and marketing expenses for Cloudflare's competitors (including tech behemoths Microsoft, Amazon, Google, Cisco, and Oracle) ranged from 2.1% to 67.4% of revenue, with an average of 24.4%. Ex. A attach. 7.1. In his analysis, Mr. Dell replaced Cloudflare's actual 48% sales-and-marketing expense ratio with the "normalized" figure of 24.4%, artificially reducing these costs by approximately half. Mr. Dell performed a similar calculation for general and administrative expenses (reducing those expenses by more than half), resulting in the figures below:

|  | FY2022, Ex. M | Costs/Profit as a Percentage of Revenue | Mr. Dell's "Normalized" expenses | "Normalized" FY2022 (Ex. A attach. 6) |
|---|---|---|---|---|
| Revenue | $975 million |  |  | $975 million |
| Cost of Revenue | $233 million | 24% | 24% | $233 million |
| Sales and marketing | $466 million | 48% | **24.4%** | **$238 million** |

| Research and development | $298 million | 31% | 31% | $298 million |
|---|---|---|---|---|
| General and administrative | $180 million | 18% | **7.5%** | **$73 million** |
| Total costs | $1.18 billion | 121% | **86%** | **$842 million** |
| Revenue – costs (Profit) | **-$205 million** | Actual profit margin: **-21%** | Normalized margin: **13.6%** | **$133 million** |

Ex. A Attachs. 7.1, 7.2. Mr. Dell cannot justify these counterfactual assumptions. Mr. Dell's methodology must be "tied to the facts of the case," *Summit 6*, 802 F.3d at 1295—there is no basis to assume that Sable and Cloudflare would estimate future profits by using *other companies'* reported expenses, or that other companies' reported expenses reflect Cloudflare's actual expenses. The evidence shows that Cloudflare is consistently unprofitable, and the Court should exclude Mr. Dell's effort to rewrite the facts in Sable's favor.

Further, for the purposes of calculating expected profit, Mr. Dell claims that it is reasonable to assume that if Cloudflare (i) cut its sales and marketing budget in half and (ii) trimmed its general and administrative costs by more than half, Cloudflare nevertheless would have earned the same amount of revenue (almost $1 billion). Mr. Dell provides no basis for this assumption. Mr. Dell admits that Cloudflare's investment in sales, marketing, general, and administrative expenses helps explain why Cloudflare earned its current revenue and customers. *See* Ex. A ¶ 237. If Mr. Dell assumes a counterfactual world where Cloudflare reduced these business-nourishing expenses, he must also determine the corresponding effect those reductions would have on revenue. Because it is fundamentally unreasonable to assume that Cloudflare's revenues would hold steady in the face of dramatic cost reductions, Mr. Dell's "normalization" procedure does not reliably calculate Cloudflare's profits under an assumption of lowered costs.[19]

---

[19] In the same vein, Mr. Dell's use of a 42% UEM suffered the same defect—Mr. Dell assumed that Cloudflare's revenue would stay constant even after reducing Cloudflare expenses by ap-

Finally, Mr. Dell's "normalization" ignores the effect of company size. The data used by Mr. Dell shows that businesses with larger revenues have lower expense ratios for sales, marketing, general, administrative expenses. The four businesses with the largest revenue had much lower expense ratios than the four (and Cloudflare) with the smallest revenue:

| | FY2022 revenue | Sales and marketing costs as a percentage of revenue, FY2022 | General and administrative costs as a percentage of revenue, FY2022 | Combined sales, marketing, general, and administrative costs, as a percentage of revenue |
|---|---|---|---|---|
| Amazon | $514 billion | 8% | 2% | 10% |
| Google | $283 billion | 9% | 6% | 15% |
| Microsoft | $198 billion | 11% | 3% | 14% |
| Alibaba | $134 billion | 14% | 4% | 18% |
| F5 | $2.7 billion | 34% | 10% | 44% |
| Check Point | $2.3 billion | 29% | 5% | 34% |
| Zscaler | $1.1 billion | 67% | 14% | 81% |
| Cloudflare | $1 billion | 48% | 18% | 66% |
| Fastly | $0.4 billion | 42% | 28% | 70% |

Ex. A attachs. 7.1-7.2, 8.3; Ex. M. Mr. Dell provides no basis for assuming that one can reliably predict Cloudflare's costs as a percentage of revenue by using companies that have 100-500 times the revenue of Cloudflare—Mr. Dell's data shows that big data companies benefit from their scale, enjoying lower costs relative to revenue. Because Mr. Dell unreasonably assumed that Cloudflare's profit margins can be predicted by considering the revenues and expenses of Amazon, Google, and Microsoft, the Court should exclude his resulting opinion as unreliable.

In sum, because Mr. Dell (i) failed to demonstrate why it is appropriate to base his royalty on profits that Cloudflare never generated, (ii) failed to adjust revenue to reflect his reduction in costs, and (iii) does not account for differences in business size, the Court should exclude Mr. Dell's "normalized" profit margins as unreliable.

_____

proximately half. The Court should also exclude Mr. Dell's UEM calculations for this second, independent reason.

### E.    Mr. Dell improperly seeks disgorgement in the guise of a royalty

Mr. Dell (i) began with Cloudflare's worldwide enterprise-customer revenue (███████ ████), (ii) applied his 20-30% apportionment figure to arrive at apportioned revenue ($████ ████████), (iii) applied a 15-42% profit margin to determine apportioned profit (███████ █████), and (iv) discounted the apportioned profit to present value based on the date of the hypothetical negotiation (August 13, 2019, Ex. A ¶ 251), resulting in discounted apportioned profits █████████████). Ex. A attach. 3. Mr. Dell then claims that Cloudflare would pay the discounted apportioned profit, <u>in its entirety</u>, as a lump sum to Sable—Mr. Dell labels the discounted apportioned profit as "discounted **royalty payment**" in the tables attached to his report. Ex. A attach. 3; Ex. A ¶ 269 (range of discounted apportioned profits of ████████████ ███); Ex. A ¶ 270 (range of applicable lump sum royalty payments ███████████████).

Paying Sable *all* of Cloudflare's apportioned profit is not a reasonable royalty—it is profit disgorgement. Profit disgorgement is codified as a remedy for every type of intellectual-property case *except* for infringement of a utility patent. *See* 17 U.S.C. § 504(a)(1) (copyright infringement); 18 U.S.C. 1836(b)(3)(B) (trade-secret misappropriation); 15 U.S.C. § 1117(a) (trademark infringement); 35 U.S.C. § 289 (design-patent infringement). In contrast, the utility-patent statute allows exactly two types of damages: (i) the lost profits a patent owner would have earned had the infringer not infringed or (ii) a reasonable royalty. 35 U.S.C. § 284; *Afro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 504-06 (1964). Because profit disgorgement is not contemplated by the patent statutes, the Court should exclude Mr. Dell's opinion that Cloudflare's apportioned profits, in their entirety, are a reasonable royalty.

Further, *Virnetx* disallowed this sort of ad-hoc split of apportioned profits. In *Virnetx*, the patent holder (i) calculated incremental (apportioned) profits earned by the infringer from the use of the asserted patents (as Mr. Dell claims to have done here), (ii) argued that the Nash Bargain-

ing Solution allowed an initial assumption that the infringer would pay the patent holder 50% of the incremental profit as a royalty, and (iii) adjusted that split to account for "the relative bargaining power of the two entities." *Virnetx*, 767 F.3d at 1331, 1333-34. The Federal Circuit found that the "assumption" of a 50% split of apportioned profits was unfounded and could not be used by the patent holder without establishing that the split reflected the facts of the case at hand. *Id.* at 1333-34 (noting that the 25% rule—assuming 25% of entire profits was a reasonable royalty—was similarly flawed). The "adjustment" of the 50% initial assumption did not save the analysis, because the starting assumption runs a "significant risk of inappropriately skewing the jury's verdict." *Id.*

Mr. Dell's analysis of the hypothetical negotiation provides no basis for his starting assumption Cloudflare would pay 100% of apportioned profits as a royalty. This assumption is untethered to the facts of this case, and on that basis alone, the Court should exclude this opinion. *Summit 6*, 802 F.3d at 1295. Further, Mr. Dell admits that there is no established royalty for the patents and that Cloudflare has not entered into any license agreements that would provide comparable royalty rates. Ex. A ¶ 256.[20] This *lack* of evidence does not justify a "starting point" of a 100% royalty, no more than it would account for the 50% or 25% rates disallowed by *Virnetx*. *See* Ex. A ¶ 270-71 (Mr. Dell characterizing the ███████████ discounted-profit range (100% of discounted profits) as a "starting point.").

Mr. Dell cannot save his analysis by ultimately concluding that the parties would agree

---

[20] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

on a royalty in the lower end of the range—"███████████████. Ex. A ¶ 274.[21] Mr. Dell

reaches this conclusion by noting "downward influence[s]" on the "starting point of the royalty

payment range indicated above," leading to a "narrowed" royalty range of ████████████

██████ Ex. A ¶¶ 271, 273, the "overriding technical importance" of the patents, Ex. A ¶

272, and Cloudflare's "realized profits and profit expectations," Ex. A ¶ 273. As in *Virnetx*, these

"adjustments" do not cure the unreliability stemming from Mr. Dell's unsupportable initial as-

sumption that Cloudflare would pay 100% of discounted apportioned profits to Sable as a royal-

ty. *Virnetx*, 767 F.3d at 1333-34. Accordingly, the Court should exclude Mr. Dell's reasonable-

royalty opinions and calculations.

### F.    Mr. Dell's alternate royalty-rate calculation at footnote 377 is unreliable

As an afterthought, on the last page of his report, Mr. Dell claims that his reasonable-

royalty opinion (a range of ██████████████, Ex. A ¶ 270) "equates to an effective royalty

of approximately ████ of apportioned revenue." Ex. A ¶ 277 n. 377. For the reasons below, this

opinion is unreliable.

*First*, Mr. Dell's math is incorrect. His claimed reasonable-royalty range of ████████

████████████████████, Garza Dec. ¶ 30, which is nowhere near his appor-

tioned-revenue estimate of ██████████. Ex. A attach. 3, p. 2. Because Mr. Dell's math

is wrong, the Court should strike the opinion as unreliable.

*Second*, Mr. Dell's lower-end royalty estimate ████████) is instead around ███ of

---

[21] Notably, the phrase "no less than" indicates that Mr. Dell has not ruled out a royalty in the
higher end of his suggested range of ██████████. Ex. A ¶ 274. Further, for Mr. Dell's
alternative, USA-customers only analysis, Mr. Dell *only* provides a royalty-payment range equal
to 100% of the apportioned profits. Ex. A attach. 12 (showing proposed discounted apportioned
profits (labeled royalty payments) ranging from ██████████████ In either scenar-
io, Mr. Dell maintains his starting opinion that a royalty equal to 100% of Cloudflare's discount-
ed apportioned profits is appropriate.

his estimate of worldwide, <u>unapportioned</u> revenue ███████, Ex. A ¶ 28). But, as discussed in greater detail above (*see* § III(B)), the Federal Circuit prohibits damages experts from basing royalties on unapportioned revenue. *C.S.I.R.O.*, 809 F.3d at 1301-02; *Virnetx*, 767 F.3d at 1329. The Court should thus strike this opinion for failure to use apportioned revenue.[22]

    *Finally*, this calculation avoids the *Georgia-Pacific* analysis that Mr. Dell claims to embrace. Instead of computing a royalty rate from credible sources (like contemporaneous licensing agreements concerning the patents-in-suit), Mr. Dell *assumes* that lower end of the royalty he calculated is correct ███████) and uses that figure to back into an "effective" royalty rate of ███ (based on unapportioned revenue of ███████). Because Mr. Dell has not shown that a ███ royalty rate is justified under *Georgia-Pacific*, he cannot use a ███ rate to calculate a reasonable royalty or justify his reasonable-royalty conclusions.

### G.    Because Mr. Dell did not set his hypothetical negotiation on the date that Cloudflare's alleged infringement began, the Court should exclude Mr. Dell's hypothetical-negotiation analysis in its entirety

    The Federal Circuit has consistently held that the date of the hypothetical negotiation is the date of first infringement. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (collecting cases). As explained above, Dr. Ng's infringement analysis is limited to three edge-server functionalities: Magic Transit, Argo for Packets, and L4Drop. Ex. B at ¶¶ 88, 114, 149, 150. L4Drop was released first (November 2018), followed by Magic Transit (August 2019) and Argo for Packets (September 2021). Ex. V at 1 (L4Drop blog post dated November 2018); Ex. A ¶¶ 113, 115.

    Mr. Dell nevertheless used August 2019 (Magic Transit's release date) as his hypothet-

---

[22] *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1311, 1318-20 (Fed. Cir. 2011) (improper for expert to "check" royalty opinion by calculating "effective" royalty rate based on total revenue of accused product—"[t]he disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury").

ical-negotiation date, rather than November 2018, when the claimed infringement via L4Drop began. Ex. A ¶ 113. Mr. Dell provided no explanation for ignoring L4Drop's release, nor did Mr. Dell provide any hypothetical-negotiation analysis for November 2018. This is not harmless error.[23] Because Mr. Dell did not use the correct hypothetical-negotiation date, the Court should exclude his hypothetical-negotiation analysis and resulting damages estimates as flawed and unreliable. *RSA*, 2021 WL 4978462, at *5.

**H.    The Court should exclude non-disclosed infringement opinions**

As explained at *supra* § III(B)(4), Dr. Ng's report is limited to three claimed infringing functionalities: an edge server running (i) L4Drop infringes the '431 Patent, (ii) Magic Transit infringes the '919 patent, and (iii) Argo for Packets infringes the '919 patent. Dr. Ng has <u>not</u> shown that (i) any other edge-server functionality sold by Cloudflare to its enterprise customers (such Workers, CDN, or zero-trust services) infringes either patent, (ii) L4Drop infringes the '919 Patent, or (iii) Magic Transit or Argo for Packets infringes the '431 patent. As such, the Court should exclude any opinions claiming that any edge-server functionality other than L4Drop infringes the '431 patent, and that any edge-server functionality other than Magic Transit and Argo for Packets infringes the '919 patent.

## IV.   CONCLUSION

For these reasons, the Court should exclude (i) Mr. Dell's opinions related to revenue, apportionment figures, apportioned revenue, profit margins, apportioned profit, and royalty payment, (ii) Dr. Ng's opinion that non-users of Magic Transit and Argo for Packets nevertheless benefit from others' use of those products, expressed at Ex. B ¶¶ 283-84, and (iii) any opinions

---

[23] *LaserDynamics*, 694 F.3d at 75-77 (noting that correct determination of date is "essential," and remanding for new trial for failure to use correct hypothetical-negotiation date) *RSA Protective Techs., LLC v. Delta Sci. Corp.*, No. 19-6024, 2021 WL 4978462, at *4-5 (C.D. Cal. Oct. 20, 2021) (excluding expert testimony for failure to use the correct hypothetical-negotiation date).

claiming that any edge-server functionality other than L4Drop infringes the '431 patent, and that any edge-server functionality other than Magic Transit and Argo for Packets infringes the '919 patent.

Dated: July 24, 2023

Respectfully submitted,

STEVEN CALLAHAN
  Texas State Bar No. 24053122
  scallahan@ccrglaw.com
CHRISTOPHER T. BOVENKAMP
  Texas State Bar No. 24006877
  cbovenkamp@ccrglaw.com
ANTHONY M. GARZA
  Texas State Bar No. 24050644
  agarza@ccrglaw.com
C. LUKE NELSON
  Texas State Bar No. 24051107
  lnelson@ccrglaw.com
MITCHELL R. SIBLEY
  Admitted *pro hac vice*
  Texas State Bar No. 24073097
  msibley@ccrglaw.com
JOHN HEUTON
  Admitted *pro hac vice*
  jheuton@ccrglaw.com
**CHARHON CALLAHAN**
**ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

*Counsel for Defendant Cloudflare, Inc.*

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for the parties have conferred by telephone in good faith on the substance of this motion but could not reach agreement, and Plaintiffs' counsel has indicated that Plaintiffs plan to oppose this motion.

STEVEN CALLAHAN

## CERTIFICATE OF SERVICE

I hereby certify that, on July 24, 2023, I served the foregoing by ECF and e-mail on the following counsel for Plaintiffs:

Dorian S. Berger, Esq.
Daniel P. Hipskind, Esq.
**BERGER & HIPSKIND LLP**
9538 Brighton Way, Ste. 320
Beverly Hills, California 90210
Telephone: 323-886-3430
Telecopier: 323-978-5508
dsb@bergerhipskind.com
dph@bergerhipskind.com

Jessica L. Gutierrez, Esq.
Spencer R. Davis-VanNess, Esq.
Christopher K. Larus, Esq.
John K. Harting, Esq.
**ROBINS KAPLAN LLP**
800 LaSalle Ave., Ste. 2800
jgutierrez@robinskaplan.com
sdavis-vanness@robinskaplan.com
clarus@robinskaplan.com
jharting@robinskaplan.com

Elizabeth L. DeRieux, Esq
**CAPSHAW DERIEUX, LLP**
114 E. Commerce Ave.
Gladewater, Texas 75647
Telephone: 903-845-5770
ederieux@capshawlaw.com

STEVEN CALLAHAN

42